JOHN S. BRANSFORD and HELEN D. BRANSFORD, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bransford v. Commissioner
Docket Nos. 1520-74, 1573-74, 1574-74, 1575-74, 6536-75.
United States Tax Court
T.C. Memo 1977-314; 1977 Tax Ct. Memo LEXIS 122; 36 T.C.M. (CCH) 1262; T.C.M. (RIA) 770314; September 19, 1977, Filed Lawrence Dortch and Justin P. Wilson, for the petitioners in docket No. 1520-74. Ervin M. *123 Entrekin,John C. Tune, and John W. Nelley, Jr., for the petitioners in docket Nos. 1573-74, 1574-74, and 1575-74. James David Leckrone, for the petitioner in docket No. 6536-75. Robert B. Nadler, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax as follows: John S. Bransford, et ux
Docket No. 1520-74 Taxable Year Ended
Deficiency
December 31, 1969
$ 8,149.00
December 31, 1970
$ 5,463.00
Robert C. Mathews, et ux
Docket No. 1573-74
December 31, 1969
$22,745.00
December 31, 1970
$ 8,874.00
Robert C. H. Mathews, Jr., et ux
Docket No. 1574-74
December 31, 1969
$ 16,795.10
December 31, 1970
$ 23,442.00
Parkway Development Company
Docket No. 1575-74
May 31, 1969
$ 9,814.29
May 31, 1970
$ 12,757.48
May 31, 1971
$ 5,688.23
Metropolitan Industrial Park, Inc.
Docket No. 6536-75
April 30, 1970
$ 1,475.00
April 30, 1972
$ 33,635.68
April 30, 1973
$ 63,987.41
April 30, 1974
$124,341.13
The issues presented for decision are as follows: *124 1. Whether the Commissioner has exceeded his authority under section 482 [2] in adjusting the sales price for land sold by Peabody Properties to Metropolitan Industrial Park, Inc., and recharacterizing the excess received by the members of Peabody Properties over its allocated portion of such sales price as a taxable distribution under sections 301 and 316. 2. In the alternative, whether Peabody Properties' gain from the sale of property to Metropolitan Industrial Park, Inc., was derived from the sale or exchange of a capital asset and therefore was taxable as capital gain, or was derived from the disposition of property held primarily for sale to customers in the ordinary course of a trade or business and therefore was taxable as ordinary income. FINDINGS OF FACT 1. General
John S. and Helen D. Bransford (petitioners in docket No. 1520-74), Robert C. and Sarah S. Mathews (petitioners in docket No. 1573-74), and Robert C. H., Jr., and Alice C. Mathews (petitioners in docket No. 1574-74) were all residents of Nashville, *125 Tennessee, on the date their petitions were filed. All three couples filed joint Federal income tax returns for 1969 and 1970 with the Director, Southeast Service Center, Chamblee, Georgia. Sarah S. Mathews, Alice C. Mathews, and Helen D. Bransford are petitioners in these proceedings solely by virtue of having signed joint Federal income tax returns with their husbands. Parkway Development Company (petitioner in docket No. 1575-74), a Tennessee corporation, filed corporate Federal income tax returns for the taxable years ended May 31, 1969, May 31, 1970, and May 31, 1971, with the Director, Southeast Service Center, Chamblee, Georgia. On the date its petition was filed, Parkway Development Company's principal offices were located in Nashville, Tennessee. Metropolitan Industrial Park, Inc. (petitioner in docket No. 6536-75), a Tennessee corporation, filed corporate Federal income tax returns for the taxable year ended April 30, 1970, with the Director, Southeast Service Center, Chamblee, Georgia, and for the taxable years ended April 30, 1972, April 30, 1973, and April 30, 1974, with the Director, Southeast Service Center, Memphis, Tennessee. On the date its petition was *126 filed, Metropolitan Industrial Park, Inc.'s, principal offices were located in Nashville, Tennessee. The following names will hereinafter be understood to refer to individual petitioners as indicated: "Bransford" for John S. Bransford "Mathews" for Robert C. Mathews "Mathews, Jr." for Robert C. H. Mathews, Jr. "Parkway" for Parkway Development Company
"MIP" for Metropolitan Industrial Park, Inc. 2. Purchase of Knapp Farm
For many years prior to 1965, George Peabody College for Teachers (hereinafter Peabody College) owned a tract of approximately 314 acres on Elm Hill Pike in Nashville, Tennessee. Peabody College operated the property, known as Knapp Farm (hereinafter referred to as the "Knapp Farm property" or "the property") as an experimental farm. Sometime prior to 1965, Mathews, Jr., contacted Felix C. Robb, president of Peabody College, about the possibility of purchasing the Knapp Farm. Mathews, Jr., and his father, Mathews, were engaged in the general contracting business and Mathews, Jr., initially was interested in developing the property as an industrial park because he believed such development of the property would greatly enhance its value. *127 He also thought such development could provide a ready source of construction contracts for R. C. Mathews Contractors, Inc., a Tennessee corporation, owned by Mathews (68 percent) and Mathews, Jr. (32 percent) and M & M Contractors, Inc., a Tennessee corporation and wholly owned subsidiary of R. C. Mathews Contractors, Inc. In the spring of 1965, Franklin G. Clark (Clark), president of First and Mid-South Mortgage Company, on behalf of himself and other investors, negotiated to purchase Knapp Farm from Peabody College. During this same time, Clark engaged Barge, Waggoner & Summer, Engineers and Planners (hereinafter Barge), to examine the Knapp Farm property and prepare a preliminary study of a proposed industrial development. In the late spring of 1965, Mathews, Jr., approached Barge for the purpose of engaging the firm to do a preliminary study for development of Knapp Farm. To avoid a conflict of interest, a representative of Barge contacted Clark regarding Mathews, Jr.'s, request before proceeding. Thereafter, an agreement was reached whereby Mathews, Jr., paid for the preliminary study and both Clark and Mathews, Jr., received the results. During the early discussion *128 stages concerning the Knapp Farm property between Mathews, Jr., and Robb, the Nashville Banner, a newspaper in Nashville, Tennessee, made some mention that Peabody College was considering the sale of the Knapp Farm property. Shortly after this appeared in the newspaper, a real estate representative of the Kroger Grocery Company (hereinafter Kroger) telephoned Mathews, Jr., and indicated that Kroger might be interested in building a warehouse on the property if purchase plans were finalized. Also about this time, the D. H. Overmyer Warehouse Company (hereinafter Overmyer) contacted Mathews, Jr., and indicated that it was interested in the property if Mathews, Jr., purchased it. During the period before April 1, 1965, Mathews, Jr., continued to communicate with representatives of both Kroger and Overmyer and tried to get a thorough understanding of their proposals and needs concerning the Knapp Farm property. Also during this period, negotiations were begun with Tennessee Pipe and Supply Corporation, Martha White Mills, Inc., and the H. D. Lee Company concerning the possibility of those companies purchasing a portion of the property. Mathews, Jr., was aided in his negotiations *129 with potential purchasers of parts of the Knapp Farm property by Bransford, who had become interested in the purchase of the property through conversations with Mathews, a long-time business associate. Kroger required railroad facilities before it could consider purchasing a part of the Knapp Farm property and Bransford was instrumental in extensive talks with representatives of L & N Railroad concerning a proposed industrial lead track for that property. In these discussions with L & N Railroad, Mathews, Jr., and Bransford held themselves out to be developers of the Knapp Farm property. Also, because of his association with the Chamber of Commerce, Bransford had knowledge of the industrial and commercial businesses interested in locating in Nashville. By letter dated September 23, 1965, George Barbee, Office of Manager, Industrial Department, Nashville Area Chamber of Commerce, informed Mathews, Jr., that the Chamber of Commerce would do everything possible in developing prospects interested in the property which Mathews, Jr., was to offer for sale. By letter dated May 19, 1965, Barge reported to Clark the results of a preliminary plan of Knapp Farm. The letter was titled: *130 "Re: Proposed Industrial Development, Knapp Farm, Nashville, Tennessee." Barge estimated that development costs of $900,000 would be required for roads, drainage, sewers, site development, and engineering. Barge expressed an opinion that industrial development would yield market values totaling $2,400,000. Mathews, Jr., received a copy of the letter in May 1965. By letter dated August 4, 1965, Robb proposed that Peabody College sell the Knapp Farm to Mathews, Jr. Several conditions were imposed, among them a $1,000,000 purchase price and that the sale be contingent upon the change in zoning of the property to an industrial classification. At the time of this proposal, Knapp Farm was zoned "agricultural." On August 20, 1965, Barge wrote to Mathews, Jr., to confirm an understanding for the firm's services in connection with the proposed development. Mathews, Jr., executed the proposed agreement. The August 20, 1965, letter to Mathews, Jr., contained certain provisions as follows: 1. Assumption of a $700 obligation of a former client (Clark) on the same project. 2. Barge would proceed toward preparing plans, sketches, and other data for proposed land use and zoning and *131 preliminary development plans. 3. After favorable action on the zoning change, Barge would prepare preliminary subdivision plans for the entire tract. 4. The preliminary fee was $5,000, chargeable one-half to land use and zoning and one-half to preparation of the preliminary plans. On or before November 1, 1965, Ervin M. Entrekin (Entrekin), was engaged to represent four parties in negotiations with Peabody College for the purchase of Knapp Farm. The parties were Mathews, Mathews, Jr., Bransford, and Parkway. The four parties represented by Entrekin had an oral agreement regarding their interests in Knapp Farm. The agreement provided for contributions of capital and divisions of profits and losses as follows: Mathews and Mathews, Jr.--50 percent; Bransford--30 percent; and Parkway--20 percent. These parties as a group will hereinafter be referred to as "Peabody Properties." Attached to Peabody Properties' 1966 partnership information return was the statement that Peabody Properties was a joint venture whose members elected under section 1.761-2(a)(2), Income Tax Regs., to be excluded from the provisions of subchapter K. The statement further provided that the provisions *132 under which the joint venture operated could be obtained from Entrekin. Any action taken by Peabody Properties required unanimous approval of all members of that group. The oral agreement entered into among Mathews, Mathews, Jr., Bransford, and Parkway established a joint venture. On November 1, 1965, Entrekin, as trustee and buyer, entered into a sales contract executed by Robb for Peabody College as seller to purchase the Knapp Farm for $1,000,000. The contract provided in part as follows: 1. The Seller in consideration of the sum of Twenty Thousand ($20,000.00) Dollars as earnest money and in part payment of the purchase price has this day sold and does hereby agree to convey by a good and valid warranty deed to said Buyer or to such person as said Buyer may in writing direct real estate located in Davidson County, Tennessee, owned by the Seller and known as Knapp Farm, a full legal description of which will be supplied at a later date. 2. The Buyer agrees to purchase said real estate and to pay therefor the sum of One Million ($1,000,000.00) Dollars to Seller upon the following terms, to-wit: Two Hundred Fifty Thousand ($250,000.00) Dollars to be paid on date of deed *133 with the remainder of Seven Hundred Fifty Thousand ($750,000.00) Dollars to be paid in ten (10) equal annual installments of Seventy-Five Thousand ($75,000.00) Dollars each, plus interest on the unpaid balance at the rate of five and one-half percent (5 1/2%) per annum, principal and interest payments to be due on the anniversary date of the deed. Buyer shall have the privilege of earlier payment of any or all of the unpaid purchase price without penalty. 3. Taxes are to be prorated as of the date of deed and possession will be given as soon as possible but no later than January 1, 1966. Buyer agrees to execute a note representing the unpaid purchase price to be secured by a deed of trust incorporated with the warranty deed in the form of an installment deed contract. * * *
5. It is contemplated that Buyer or the beneficiaries of the trust of which Buyer is the trustee will develop the said property commercially and Seller agrees to execute partial releases to Buyer upon any property so developed or sold upon payment by Buyer to Seller of an amount equal to the proportion which the total number of acres equals when divided into the purchase price hereunder. The lien *134 of the installment deed will be released as to one-fourth of the property at the closing. The land to be released will be based upon Buyer's preliminary subdivision plan of the property. Buyer shall develop the property in an orderly manner so that Seller will not be called upon to make an unreasonable release leaving any portion of the property not conveyed isolated and having less value than the lot released. 6. This contract is contingent upon the property being zoned industrial classification by the Planning and Zoning Commission of the Metropolitan Government of Nashville Davidson County, Tennessee without any limitations as to height or otherwise in such reclassification of zoning. Buyer is to make immediate application for such change in zoning and to exercise reasonable diligence in obtaining such reclassification, and Seller agrees to cooperate to any extent necessary or desired by Buyer in obtaining such reclassification. In the event such zoning reclassification is denied, Seller agrees to refund to Buyer the earnest money deposited. * * *
Around January 1966, Robert Baltz, Jr., on behalf of himself and four brothers--Douglas M. Baltz, Frank J. Baltz, Dennis L. *135 Baltz, and John T. Baltz--acquired an interest in Peabody Properties. The interests in Peabody Properties then were: Mathews
22.5 percent
Mathews, Jr.
22.5 percent
Bransford
25 percent
Parkway
20 percent
Robert Baltz, Jr.
10 percent
100 percent
By letter dated February 25, 1966, Mathews, Jr., notified Robert T. Coleman, president of Parkway, as follows: * * * [We] had to allow Mr. Robert Baltz to buy 10% of the syndicate in exchange for the necessary railroad rights-of-way that he owned and his help and cooperation in securing the other individually owned rights-of-way. At first this transaction seemed to be a pretty tough trade on the part of Mr. Robert Baltz, however, it is my candid opinion that we would not have been able to secure these rights-of-way or the cooperation of the magistrate in that district without his assistance. In the same letter, Mathews, Jr., also apprised Coleman of the status of the purchase plans for the Knapp Farm property and of the negotiations with prospective users of that property as follows: As you may know, the Kroger Company has abandoned their expansion program here in Nashville; therefore, the 45 acre tract *136 sale that Mr. Bransford and I handled is cancelled. However, we have, through Mr. George Barbee of the Chamber of Commerce and other selected realtors, some prospective 10 and 15 acre tract users. Perhaps we will be able to bring several of these pending sales into focus before our closing with Peabody. I have asked Ervin [Entrekin] to submit to us a procedure that we might follow in handling this property so that we may realize the maximum capital gains, if any. Through your many real estate dealings, I am sure that you have had an opportunity to analyze this problem and we would welcome any suggestions that would be beneficial as a tax saving. On December 1, 1965, Mathews, Jr., filed a petition with the Metropolitan Planning Commission for a zoning change of Knapp Farm from agricultural to industrial A. The stated reason for the change was: "To permit development of the land as an industrial park." By letter dated December 30, 1965, Ora R. Adams (Director, Urban Design Division, Planning Commission, Metropolitan Government of Nashville and Davidson County), notified Mathews, Jr., that the Metropolitan Planning Commission had approved MIP subject to minor amendments. *137 On April 1, 1966, Peabody College conveyed title of Knapp Farm to Entrekin, trustee for Peabody Properties. On the same date, Entrekin, as trustee, executed On the same date, Entrekin, as trustee, executed and delivered to a representative of Peabody College a note in the amount of $750,000 and a cashier's check for $225,771.75. 3. Organization of MIP
From the outset of negotiations to purchase the Knapp Farm, Mathews, Jr., desired to develop the property as an industrial park. Yet he realized that a corporate vehicle was needed to limit personal liability. Further he was advised by his father and the other members of Peabody Properties that, because of his inexperience in developing real estate, a corporation should be organized under the guidance of a person knowledgeable in that field. Thus, before the property was purchased by Entrekin, as trustee, Mathews, Jr., met with Herschel Greer (Greer), a leading real estate developer in the Nashville area, to discuss the possibility of Greer taking charge of development of the Knapp Farm property. As a result of these conversations with Greer, MIP was organized as a Tennessee corporation, and Greer agreed to serve as president. *138 In a letter dated April 19, 1966, to members of Peabody Properties, Mathews, Jr., stated as follows: Ervin M. Entrekin is forming a corporation -- Metropolitan Industrial Park -- which will develop the Knapp Farm. Mr. Herschel Greer will be president of the corporation. At the present time the Development Company has the following options outstanding: D. H. Overmyer 6.1 acres at $14,000 per acre. H. D. Lee Company 10 acres at $15,500 per acre. Mr. Eric Newsom, D. H. Overmyer's real estate representative from Atlanta, requested that I finalize the additional options for two more 6 acre tracts which he and I discussed at the time of their original option. This is being done with the guidance of our engineers, Barge, Waggoner, and Sumner, and our attorney, Ervin M. Entrekin. MIP was incorporated on May 3, 1966, with initial contributed capital of $30,000. MIP issued 300 shares of common stock on May 10, 1966. These shares constituted the outstanding voting stock of MIP from May 10, 1966, through the present. The records of MIP disclosed the issuance and transfer of MIP stock as follows: Certificate
No. of Date
No.
Issued To
Shares
5/10/66 1
Leon Beard
50
5/10/66 2
Ervin M. Entrekin
25
5/10/66 3
William R. Manier III
25
5/10/66 4
R. C. Mathews
67.50
Contractors, Inc.
5/10/66 5
Parkway Development
30
Company
5/10/66 6
Robert Baltz, Jr.
15
5/10/66 7
John S. Bransford
21.75
5/10/66 8
John S. Bransford, Jr.
9.375
5/10/66 9
McGavock Dickinson
6.375
Bransford
5/10/66
10
Guaranty Realty Company
50
7/26/72 11 (Transfer)
Flemstom Company
9.375
*139 McGavock Dickinson Bransford and John Bransford, Jr., were the sons of Bransford. William R. Manier III was the son-in-law of Mathews and the brother-in-law of Mathews, Jr. Greer was the president of Guaranty Realty Company, a company with substantial operations and numerous employees. He was also president of Suburban Industrial Development Company, Inc., which developed one of the first large industrial parks in the Nashville community. Leon Beard was a real estate agent with Guaranty Realty Company. Entrekin was the trustee of Peabody Properties and the attorney for both Peabody Properties and MIP. Greer and Beard were the only two individuals connected with MIP who had previous experience in developing industrial parks. The initial board of directors of MIP consisted of Greer, Entrekin, William R. Manier III, Mathews, Jr., and Robert T. Coleman. Robert T. Coleman was the president of Parkway. These individuals continued to serve as directors during the period in question. From its inception until his death on March 19, 1976, Greer served as president of MIP; Bransford served as vice-president; Entrekin was the secretary; and Mathews, Jr. was treasurer. 4. Option *140 Agreement and Contract of Sale Between Peabody Properties and MIP
On May 3, 1966, Entrekin, as trustee, executed an Option Agreement and Contract of Sale with Greer on behalf of MIP whereby MIP was given an option "to purchase all or any part of the property known as Knapp Farm." The agreement reflected terms discussed by Mathews, Jr., and Greer. Greer guaranteed that the initial capitalization would exceed $25,000. The document was notarized and recorded on September 2, 1970. The Option Agreement and Contract of Sale provided in pertinent part as follows: 1. (a) The original term of this agreement shall extend for a period of two hundred, seventy (270) days from the date of final execution hereof. (b) Said original term may be extended for three successive periods of one hundred, eighty (180) days, (each first extended terms) from and after said original term by purchase of not less than ten (10) acres of land from optionor on or prior to the first day respectively, of each of the said first extended terms. (c) Said original and first extended terms may be extended for five (5) years from and after said original and first extended terms by either payment of $25,000 *141 cash, or the purchase of fifty acres on or prior to the first day of said second extended term. 2. Such right and option shall be exercisable at any time during the original or extended terms hereof. If this option is not so exercised, then all rights and obligations of each party under this Agreement shall cease and determine and this agreement shall be of no further force or effect except as otherwise provided hereinafter in this agreement and except that optionee shall provide optionor with copies of any engineering data, topographical surveys, soil boring results and the like obtained by optionee with regard to the land if optionor shall request optionee so to do in a writing received by optionee within fifteen (15) days after the expiration of the period during which this option may be exercised. * * *
4. If this option is exercised, the optionee shall designate that portion of the land it desires to purchase in said notice and optionor shall agree to any designation provided the same shall designate not less than ten (10) acres of land and further provided that the land so designated is not situated so that the sale will leave any part of the remaining property *142 isolated and of less value than prior to such sale. The purchase price to be paid by optionee to optionor for the land shall be Two Million, Eight Hundred Fifty-four Thousand, Five Hundred Dollars ($2,854,500.00) for three hundred, twelve (312) acres of land. If there are more or less than three hundred, twelve (312) acres of land, said price shall be determined at the rate of Ten Thousand, Seven Hundred, Seventy Dollars and Fifty Cents ($10,770.50) per acre for all acreage except that portion of the property lying north of the Strasser property on the southeasterly side of Elm Hill Pike and three hundred (300) feet off said Elm Hill Pike and that portion of the property that is subject to flooding, all as shall be determined by an accurate survey of the premises by a licensed engineering firm agreed upon by the parties, and that portion of the acreage off of the Strasser property on the southeast side of Elm Hill Pike and three hundred feet off said pike shall be determined at the rate of Five Thousand Dollars ($5,000.00) per acre and that portion of the acreage determined by said licensed engineering firm as subject to flood shall be at the rate of Three Thousand Dollars ($3,000.00) *143 per acre. The purchase price shall be paid in cash at the closing. * * *
12. It is hereby specifically agreed that time is of the essence of this Agreement. * * *
Thus, assuming the option was exercised as to all of the Knapp Farm property, the sales price under the terms of the agreement was to be approximately $2,854,000. Subsequent to the execution of the option agreement, Peabody Properties sold portions of the property to MIP over a period of 10 years ending April 30, 1976. Most of this land was resold by MIP shortly after title was transferred to MIP, and MIP realized $5,121,599 [3] from these sales. An example of the normal procedure utilized by Peabody Properties and MIP under the agreement was as follows: On October 3, 1966, Entrekin, as trustee, conveyed 12.07 acres to MIP. On October 19, 1966, MIP conveyed 10.25 acres of this land to H. D. Lee Company for $15,500 an acre or a total of $158,875. All but a very small number of these deeds to the third party purchasers were executed by Greer on behalf of MIP. *144 5. Business Operations of MIP
MIP had no employees and paid no salaries, except for a $15,000 salary paid to Mathews, Jr., in 1968. The business offices of MIP, R. C. Mathews Contractors, Inc., and M & M Contractors, Inc., were located at 478 Craighead Street, Nashville, Tennessee. MIP itself did not perform the development activities for the Knapp Farm property. Rather MIP made agreements with contractors to install roads, sewers, etc. Much of the work performed in developing the Knapp Farm property was done by R. C. Mathews Contractors, Inc. R. C. Mathews Contractors, Inc., generally received 10 percent for overhead and profit on the work performed for MIP.
MIP's total development costs (not including land costs) through April 30, 1975, were $2,077,630.27. MIP incurred and paid development costs to R. C. Mathews Contractors, Inc., and M & M Contractors, Inc., for the fiscal years April 30, 1967 through April 30, 1976, in the amounts of $602,896 and $784,883, respectively. On at least two occasions, Mathews, Jr., and Greer had disagreements as to the basic operation of MIP. Greer wanted Guaranty Realty Company to have the exclusive agency for sale of the property. *145 However, after conversations with Mathews, Jr., it was agreed that Greer was to spearhead the sales efforts of MIP, but Guaranty Realty Company was not to have the exclusive agency. Thus Mathews, Jr., along with Greer and Leon Beard, negotiated on behalf of MIP with prospective purchasers of the property. On another occasion, United Parcel Service approached MIP concerning its interest in having a building constructed on the Knapp Farm property and subsequently leased to them. Mathews, Jr., believed, in this instance, that it would be more profitable for MIP to pursue the build-lease concept rather than merely selling the lots to United Parcel Service. However, on the advice of Greer and Leon Beard, Mathews, Jr., was overruled. Subsequently, Mathews and Mathews, Jr., acquired 13.06 acres from MIP for $160,000 pursuant to a sale contract between United Parcel Service and MIP which had been formally assigned to R. C. Mathews Contractors, Inc., by United Parcel Service. Mathews and Mathews, Jr., thereafter implemented the build-lease idea originally discussed with MIP. The construction of the building was completed by R. C. Mathews Contractors, Inc., on or about January 15, 1968, and *146 the lease payments commenced at that time. An industrial lead track agreement dated January 6, 1966, was entered into by L & N Railroad and "John S. Bransford and Robert C. H. Mathews, Jr. and Associates, Developers of the so-called Knapp Farm, Nashville, Davidson County, Tennessee." Subsequently this agreement was redrafted to substitute MIP for Bransford and Mathews, Jr., "and Associates." During the 10-year period from May 1966 to April 1976, Peabody Properties sold to MIP over 90 percent of the Knapp Farm. During this period, MIP purchased 310.10 acres from Peabody Properties, and as of April 1976, MIP had resold 289.56 of such 310.10 acres. Purchases by Kroger, [4] Martha White Mills, Inc., and the H. D. Lee Company, all stemming from the early discussions with Mathews, Jr., before acquisition of the Knapp Farm property from Peabody College and before the organization of MIP, are reflected in the total amount sold by MIP. MIP paid for some of the property transferred to it by Peabody Properties with promissory notes. Interest at the rate of 9 or *147 10 percent was stated on these notes but no interest was paid. These notes were repaid periodically. MIP's reported taxable income, before net operating losses, for the 10 years May 1, 1966, through April 30, 1976, was as follows: April 30, 1967
($ 30,567)
April 30, 1968
$ 8,617 April 30, 1969
($ 3,850)
April 30, 1970
$ 38,388 April 30, 1971
($ 6,398)
April 30, 1972
($ 6,290)
April 30, 1973
($ 21,643)
April 30, 1974
$ 93,041 April 30, 1975
($ 32,826)
April 30, 1976
$ 78,313 For 10 years of operation, the years May 1, 1966 to April 30, 1976, MIP's net earnings from operations, as reported on its returns, totaled $116,785. During the 10-year period May 1, 1966, through April 30, 1976, MIP paid $2,787,272 for the 310.10 acres of Knapp Farm property purchased from Peabody Properties. Accordingly, the gain to the members of Peabody Properties in excess of their basis of $1,000,000 amounted to $1,787,272. For 1969 and 1970, the owners of Peabody Properties reported long term capital gain on the sale of tracts of land from Knapp Farm as follows: 1969
1970
Bransford
$ 39,131.00
$ 21,419.00
Mathews
60,721.00
33,236.00
Mathews, Jr.
60,721.00
33,237.00
Parkway
38,791.58
53,974.00
*148 Parkway also reported long term capital gain of $29,544 for 1971. In his statutory notices of deficiency issued to each of these petitioners (Bransford, Mathews, Mathews, Jr., and Parkway), respondent determined the above amounts reported as long term capital gain were taxable as ordinary income. In his statutory notice of deficiency issued to MIP for the taxable years 1972, 1973, and 1974, [5] respondent determined, under the authority of section 482, that the basis of the land sold by Peabody Properties to MIP was $1,000,000 rather than approximately $2,800,000 as reflected by petitioner MIP in its returns for those years. Accordingly, respondent increased MIP's taxable income for 1972, 1973, and 1974 in the respective amounts of $89,906, $168,491.78, and $237,300.93. In an amendment to the answer in docket Nos. 1520-74, 1573-74, 1574-74, and 1575-74, respondent alleged that the sale of the 312 [6] acres by Peabody Properties to MIP was not an arm's-length transaction and, relying on section 482, *149 determined the correct sales price to be $1,000,000, reallocating the proportionate amounts received in excess of that figure to Peabody Properties. Amounts received by Bransford, Mathews, Mathews, Jr., and Parkway, as joint venturers in Peabody Properties, in excess of their respective portions of the gain attributable to the sales price in excess of $1,000,000 were alleged to be taxable as distributions under sections 301, 316, and 318. OPINION 1. Section 482 Issue Concerning MIP
Section 482 provides that where "two or more organizations, trades, or businesses" are "owned or controlled" by the "same interests," the Secretary or his delegate may "distribute, apportion, or allocate gross income, [or] deductions" among those entities. The Secretary is authorized to make the distribution or apportionment if he determines that such action is "necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, *150 or businesses." Respondent argues that the same interests controlled MIP and Peabody Properties and that the arm's-length sales price for the Knapp Farm property was $1,000,000 rather than approximately $2,854,000. Under the alleged authority of section 482, respondent reduced the annual deductions for land costs claimed by MIP in each of the years at issue. We think that respondent has exceeded his authority in applying section 482 to the facts in the instant case. A. Common ownership or control
The language of section 482 is broad, and its application depends on a finding of either ownership or control. The type of control contemplated by the statute is characterized in section 1.482-1(a)(3), Income Tax Regs., as follows: The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. * * * Thus "actual control," not record ownership, is determinative. Collins Electrical Co. v. Commissioner,67 T.C. 911, 919 (1977); Brittingham v. Commissioner,66 T.C. 373, 396 (1976), *151 on appeal (5th Cir., Dec. 27, 1976). The concept of "actual control" was discussed by the Supreme Court in Commissioner v. First Security Bank of Utah, N.A.,405 U.S. 394, 404-405 (1972), affg. 436 F.2d 1192 (10th Cir. 1971), revg. a Memorandum Opinion of this Court, as follows: The regulation, [7] as applied to the facts in this case, contemplates that Holding Company-- the controlling interest--must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under section 482. The issue then is whether any one or more interests had complete *152 power to shift income between MIP and Peabody Properties. Respondent does not specifically identify the interests which he contends controlled both Peabody Properties and MIP. Rather he focuses in general on "the group embracing Mathews, Jr. but larger than Mathews, Jr., individually." To be sure, Mathews, Jr., was the central figure in spearheading the planning and industrial development of the Knapp Farm property. He brought together the forces necessary to purchase that property; he negotiated with possible users of the property; he was instrumental in the formation of MIP; and the two closely-held corporations which he owned with his father performed the bulk of the contract development work for MIP. However, viewing the record in its entirety, we do not think Mathews, Jr., or any group including him was in actual control of both Peabody Properties and MIP within the meaing of section 482. From the very beginning of negotiations to purchase the Knapp Farm property, Mathews, Jr., desired to develop that property as an industrial park. However, his eagerness was tempered by his father's insistence, due to Mathews, Jr.'s, inexperience, that a person knowledgeable in the *153 field of real estate development should be employed to oversee such an enterprise. The other members of Peabody Properties shared Mathews' sentiments. Thus MIP was formed, and Greer, a leading real estate developer in the Nashville area, was selected to head up that corporation and the development of the Knapp Farm property. Mathews, Jr., owned only a 22.5-percent interest in Peabody Properties.Robert T. Coleman, president of Parkway, Bransford, and Mathews, all members of Peabody Properties, testified at trial, truthfully we think, that any action taken on behalf of that entity required the unanimous approval of its members. Thus it is clear that neither Mathews, Jr., nor any group of less than all of the members of Peabody Properties, owned or controlled that organization. Mathews, Jr., owned 32 percent of R. C. Mathews Contractors, Inc., which in turn owned 22.5 percent of MIP's stock. Obviously nothing that Mathews, Jr., alone did not control Peabody Properties and MIP, respondent shifts his focus to contend that certain other members in Peabody Properties acted together with Mathews, Jr., to control MIP. Presumably this group consists of Parkway, Bransford, and Mathews, *154 as well as Mathews, Jr., whose stock ownership together did not exceed 50 percent of the outstanding stock of MIP. Respondent further suggests that since Entrekin was the trustee for Peabody Properties, an 8.33-percent shareholder in MIP, and the attorney for both of those entities, and that since Manier was the brother-in-law of Mathews, Jr., and an 8.33-percent shareholder of MIP their interests cannot be separated from the alleged controlling group. There are, however, several fallacies in respondent's position. First, Greer, who was the president of Guaranty Realty Company, a 16.66-percent shareholder in MIP, served as president of MIP and a member of the board of directors of that corporation until his death in 1976. He held no interest in Peabody Properties. Greer and Leon Beard, an employee of Guaranty Realty Company and a 16.66-percent shareholder in MIP, were the only two individuals connected with MIP who had extensive expertise in real estate development. They dominated the sales activities of MIP and supervised the development. Except for the fact that Guaranty Realty Company was not granted an exclusive agency for the sale of the developed Knapp Farm property, *155 apparently the result of arm's-length discussions between Greer and Mathews, Jr., we see nothing in the record to indicate that Greer was made to succumb to the interests of Mathews, Jr., or the other members of Peabody Properties while occupying a leadership role with MIP. Not only is it inconceivable that his own self interest would have permitted him to participate in a plan to shift approximately $1,854,000 from MIP to Peabody Properties, it is equally unlikely that he would have rendered himself vulnerable to claims by other MIP shareholders for violating his fiduciary obligation, as president of the corporation, to protect and preserve their interests. Respondent contends that, since Greer was never paid any compensation by MIP, since the business offices of MIP were at the same location as those of R. C. Mathews Contractors, Inc., and since the board of directors of MIP were, for the most part, inactive, Greer was a figurehead in MIP. We do not think this inference is permissible. Greer was his own man. On at least one occasion, Greer overruled the expressed wishes of Mathews, Jr.In that instance, United Parcel Service had an option to purchase a lot for $160,000 from *156 MIP, and United Parcel Service preferred to have a structure built on the lot and to lease both on a long-term basis. Mathews, Jr., thought this build-lease concept would be profitable to MIP, but, on the advice of Greer and Beard, the proposal was turned down. Subsequently, Mathews and Mathews, Jr., purchased parcels from MIP, and they implemented the plan originally proposed to MIP.
Other factors also indicate that Greer was active in the operations of MIP. As president of MIP from its incorporation until his death, Greer executed on behalf of MIP the option and sale agreement for the purchase of the Knapp Farm property from Peabody Properties; he was looked to for his guidance and expertise in MIP's development activities; he supervised such development; he signed most of the deeds transferring the property from MIP to the ultimate purchasers; and he played an active role in the sales of the property developed by MIP. On the basis of these facts, we believe that Greer possessed and displayed both real and potential powers of control in the affairs of MIP. Second, in including Entrekin and Manier within the controlling group, respondent appears to ignore the "same interests" *157 requirement of section 482. The term "same interests" is not defined in the statute or regulations, but we pointed out in Brittingham v. Commissioner,66 T.C. at 397-398: In using the term "same interests," Congress apparently intended to include more than "the same persons" or "the same individuals." Different persons with a common goal or purpose for artificially shifting income can constitute the "same interests" for the purposes of the statute. Cf. Rishell Phonograph Co.,2 B.T.A. 229, 232-233 (1925). Thus, it is not necessary that the same person or persons own or control each controlled business before section 482 can be applied, but there must be a common design for the shifting of income in order for different individuals to constitute the "same interests." * * * It is obvious that neither Entrekin nor Manier played any part in the ownership or control of Peabody Properties. Since neither had any financial interest in Peabody Properties, any transaction benefitting that entity to the detriment of MIP would be clearly detrimental to their interests in MIP. We think it is improbable that Entrekin and Manier, viewed as elements of MIP's *158 controlling group, would be parties to a common design for the shifting of income in the amount of approximately $1,854,000 from MIP to Peabody Properties in which they held no interest. [8]
Third, Robert Baltz, Jr., who owned a 10-percent interest in Parkway and 5 percent of the stock in MIP, is conspicuously absent from the group which respondent contends controlled MIP. Since unanimous consent of all members of Peabody Properties was necessary before any action on behalf of that entity could be taken, we think his deletion from the alleged controlling group draws suspicion to respondent's position. Significantly, Baltz was not one of the original group who purchased the Knapp Farm property. As detailed in our Findings, he was evidently permitted to become one of the joint venturers because he demanded it in exchange for railroad rights-of-way that he controlled. Since he owned an interest in both MIP and Parkway and since unanimous consent of the members was required *159 for action by Peabody Properties, he could be expected to weigh his self interest carefully in taking any management positions. On the basis of the foregoing, we find, in the above-quoted words of section 1.482-1(a)(3), Income Tax Regs., that "the reality of the control" of Peabody Properties and MIP was not vested in, or exercised by, the "same interests." The issue, we recognize, is a difficult one, and we base our conclusion to a large extent on the credibility of some of the witnesses. However, on review of all the evidence, we are convinced that the owners of Peabody Properties did not have "complete power" to shift income from MIP to Peabody Properties. Commissioner v. First Security Bank of Utah, N.A.,405 U.S. at 404-405. B. Arm's-length sales price
Peabody Properties executed a contract of sale to purchase the Knapp Farm property for $1,000,000 on November 1, 1965. On April 1, 1966, Peabody Properties closed the sale. In April and May 1966, MIP was organized. At this same time, through conversations between Mathews, Jr., and Greer, an agreement was reached for MIP's purchase of the Knapp Farm property from Peabody Properties for a total price *160 of approximately $2,854,000. Respondent contends that the sales price of $2,854,000 was determined not as the result of arm'slength bargaining and was excessive since it was approximately $1,854,000 more than Peabody Properties paid for the same property only some 30 days earlier. We are convinced that the transaction entered into between Peabody Properties and MIP was fair and resulted from arm's-length bargaining and that respondent acted unreasonably in determining that $1,000,000 represented an arm's-length price for the sale of the Knapp Farm property from Peabody Properties to MIP.Cf. Hamburgers York Road, Inc. v. Commissioner,41 T.C. 821, 835 (1964); Ballentine Motor Co. v. Commissioner,39 T.C. 348, 357 (1962), affd. 321 F.2d 796 (4th Cir. 1963). The option and sale agreement reached on May 3, 1966, was not one for the immediate sale of the entire tract of undeveloped land on that date. Rather the agreement represented an option granted to MIP to purchase at a fixed price over an extended period all or a portion of the property in parcels not smaller than 10 acres. The prices set in the agreement ranged from $3,000 per *161 acre for a smaller part of the property to $10,770.50 per acre for most of the property. MIP immediately thereafter began development activities which greatly enhanced the value of the property and exercised its option to buy a parcel of the property only when prospects were good for such parcel's resale to an industrial user. Although the time limitation for exercising the options was not strictly observed, MIP nevertheless purchased over a 10-year period each parcel at the price stated in the original agreement. At the time of the agreement, Mathews, Jr., and Greer knew from the May 19, 1965, Barge engineering report, that development costs were projected to be $900,000. In fact, by April 30, 1975, MIP had expended $2,077,630.27 in development costs. The Barge report estimated the market value of the property as an improved industrial subdivision to be in the range of $2,400,000, whereas by April 30, 1976, MIP had realized $5,121,599 from the sale of the land. Indeed, at the time the option agreement was executed, the H. D. Lee Company held an option to buy property from MIP at a price of $15,500 per acre, and such option was subsequently exercised at that price. Overmyer *162 had taken an option on 6.1 acres at $14,000 per acre. These facts indicate that the option price agreed upon by Peabody Properties and MIP was not unreasonable or excessive and that it would allow MIP to resell the developed property at a profit. Moreover, the sales price for the property was reached through a meaningful exchange. It is true the raw land was not worth $2,854,000 on May 3, 1966. Neither Greer nor anyone else expected MIP to pay that amount with invested capital of only $30,000. However, MIP was under no binding obligation to purchase all the property. It could select over a period of years those parcels which it wished to purchase after negotiating with potential buyers. Thus, Peabody Properties retained title to the property until MIP developed individual tracts and found buyers for them. Peabody Properties thus assumed the risk that part of the property might remain unsold. MIP, on the basis of negotiations which were taking place contemporaneously with the organization of that corporation, could project a profit over the agreed sales price. MIP bore the risk that projected development costs would escalate but reaped the benefit of any substantial appreciation *163 in the value of the property as it was developed. Finally, the overall figures resulting from the option agreement and subsequent development and sales activities do not reflect nonarm's-length dealings between the parties. While MIP was to pay Peabody Properties a total amount of approximately $2,854,000 for the property and had, in fact, paid $2,787,272 as of April 30, 1976, it had $5,121,599 in real estate sales through April 30, 1976. For its 10 years of operation, MIP made a net profit of $116,785 on an initial shareholder investment of $30,000. This profit would have been substantially greater had development costs been as originally estimated. Also, as of April 30, 1976, there was an additional amount of property received from Peabody Properties which remained unsold by MIP and from which profit could be realized. Thus we conclude that there was no shifting of income between Peabody Properties and MIP in such a way to cause the "true taxable income" of MIP to be understated. Accordingly, we hold that no price adjustment was authorized by section 482. Commissioner v. First Security Bank of Utah, N.A.,405 U.S. at 404-405. 2. Capital Gains Issue *164 Concerning Petitioners Mathews, Mathews, Jr., Bransford, and Parkway
Respondent contends that Peabody Properties' activities with regard to the buying and selling of the Knapp Farm property constituted a business and thus gain from the sale of that property to MIP is taxable as ordinary income because the property was held by petitioners for sale in the ordinary course of that trade or business. [9] We agree. The statutory definition of a capital asset excludes gains from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 1221(1). Since the capital gains provision represents "an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly" in order "to effectuate the basic congressional *165 purpose." Corn Products Co. v. Commissioner,350 U.S. 46, 52 (1955), affg. 215 F.2d 513 (2d Cir. 1954), affg. in part 16 T.C. 395 (1951); Commissioner v. P. G. Lake, Inc.,356 U.S. 260, 265 (1958), revg. 241 F.2d 71 (5th Cir. 1957), affg. 24 T.C. 1016 (1955); Kaltreider v. Commissioner,255 F.2d 833, 838 (3d Cir. 1958), affg. 28 T.C. 121 (1957). Whether the gains here are subject to ordinary income or capital gains rates is basically a question of fact, and an objective rather than a subjective approach to the facts is required. Pointer v. Commissioner,48 T.C. 906, 915 (1967), affd. 419 F.2d 213 (9th Cir. 1969). In deciding whether property was held primarily for sale to customers in the ordinary course of business, the many litigated cases involving this issue have considered the following factors: (1) The purpose for which the property was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller, his agent, or those acting in concert with him in the improvement and disposition of the property; *166 (4) the extent of improvements made to the property sold; (5) the proximity of sale to purchase; (6) the ordinary business of the taxpayer; and (7) the extent of advertising, promotion, or other active efforts employed in soliciting buyers for the sale of the property. Howell v. Commissioner,57 T.C. 546, 554 (1972); Pointer v. Commissioner,supra at 915-916; Hoover v. Commissioner,32 T.C. 618, 625 (1959); Bauschard v. Commissioner,31 T.C. 910, 916 (1959), affd. 279 F.2d 115 (6th Cir. 1960). Bearing the foregoing considerations in mind, we have concluded that petitioners Mathews, Mathews, Jr., Bransford, and Parkway, members of the joint venture known as Peabody Properties, along with Baltz, [10] held the Knapp Farm property primarily for sale to customers in the ordinary course of their business. *167 From the very outset of negotiations to purchase the Knapp Farm property, Mathews, Jr., was interested in developing that property as an industrial park. Before the April 1, 1966, closing on the Knapp Farm property, Mathews, Jr., participated in negotiations with Kroger, the H. D. Lee Company, Martha White Mills, Inc., and other parties concerning their desire to purchase some part of that property for industrial use. Mathews, Jr.'s, letter of April 19, 1966, stated that Overmyer and H. D. Lee Company had already been given options on two parcels. As a condition to its purchasing property, Kroger required rail service to be installed. Hence Mathews, Jr., initiated discussions with L & N Railroad relating to the construction of an industrial lead track on the property. Also, before April 1, 1966, he entered into an agreement with Barge for engineering services to include plans for zoning and subdivision and filed a petition for a zoning change from agricultural to industrial. The reason stated for such reclassification was: "To permit development of the land as an industrial park." Bransford's activities during this early period were also important. He participated with Mathews, *168 Jr., in extensive negotiations with L & N Railroad. In these discussions Bransford and Mathews, Jr., held themselves out to be developers of the Knapp Farm property. Also Bransford was instrumental in securing the assurance from the Nashville Area Chamber of Commerce that that entity would aid in finding prospective buyers for the Knapp Farm property. Even though Mathews' and Parkway's development activities may have been less than those of Mathews, Jr., and Bransford, they cannot be separated from the activities carried on by the latter two members of the joint venture. Mathews obviously knew of his son's plans for developing and selling the Knapp Farm property, and there is no evidence to indicate that he disapproved of these activities outside the fact that he did not want Mathews, Jr., to do the development personally and without expert guidance. Also Parkway knew of Mathews, Jr.'s, early efforts at reaching prospective purchasers, as evidenced by his February 25, 1966, letter to Robert T. Coleman, president of Parkway, in which he stated in part as follows: However, we have, through Mr. George Barbee of the Chamber of Commerce and other selected realtors, some prospective *169 10 and 15 acre tract users. Perhaps we will be able to bring several of these pending sales into focus before our closing with Peabody. Finally there is no evidence of the exercise of the veto power which each member of Peabody Properties possessed with respect to any transaction taken on behalf of that entity. [11]
Statements in the November 1, 1965, contract of sale between Peabody College and Entrekin, as trustee for Peabody Properties, also support the conclusion that the members of Peabody Properties intended from the outset to subdivide and develop the Knapp Farm property for ultimate sale. That contract states in part as follows: 5. It is contemplated that Buyer [Entrekin as trustee] or the beneficiaries of the trust of which Buyer is the trustee will develop the said property commercially and Seller agrees to execute partial releases to Buyer upon any property so developed. * * * Buyer shall develop the property in an orderly manner * * *. 6. This contract *170 is contingent upon the property being rezoned industrial classification. * * * [Emphasis supplied.] Thus, we conclude that the joint venture, Peabody Properties, acquired the Knapp Farm property for the sole purpose of developing it and selling it to industrial users. Clearly, Peabody Properties, prior to obtaining title, held its right to the land covered by the November 1, 1965, sales contract with Peabody College and, after April 1, 1966, the land itself, primarily for sale to customers in the ordinary course of its business. The issue remains as to whether the organization of MIP and the execution of the May 3, 1966, agreement giving MIP an option to buy the property changed the purpose for which Peabody Properties held the Knapp Farm property. Compare United States v. Winthrop,417 F.2d 905 (5th Cir. 1969); Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1283 (1970). We think they did not. MIP merely completed many of the activities initiated by Mathews, Jr., Bransford, Mathews, and Parkway's president prior to the execution of the May 3, 1966, contract. We have held that Peabody Properties did not control MIP within the meaning *171 of section 482, but the owners of Peabody Properties also owned some MIP stock and contributed materially to MIP's sales and development activities both before and after the execution of the May 3, 1966, agreement. Ordinarily, MIP did not exercise its option as to individual parcels until it had a prospective buyer. Consequently, Peabody Properties' business continued to be the promotion of sales of the Knapp Farm land, and the mere fact that Peabody Properties sold its land only to MIP does not alter this conclusion. Compare Thrift v. Commissioner,15 T.C. 366, 371 (1950). Under the terms of the May 3, 1966, agreement, MIP was given an option to purchase "all or any part of the property." To the extent the option was exercised, it immediately achieved the purpose for which Peabody Properties had acquired and held the property-- to resell it at a profit.And the income here in dispute is the income derived from MIP's exercise of that option with respect to specific parcels. In a very real sense, the separate sales to MIP, for purposes of determining the character of the gain, related back to the date of the option, and the purpose for which the property was held *172 at that time is decisive. Moreover, the MIP option agreement contained certain provisions which were designed to protect Peabody Properties from any failure on MIP's part to buy parcels of the larger tract. The option agreement was effective for only 270 days. However, it could be extended for 3 successive periods of 180 days each after the expiration of the original term by the purchase of not less than 10 acres of land on or prior to the first day, respectively, of each of the extended terms. It could be extended for an additional 5 years by either the payment of $25,000 in cash or the purchase of 50 acres on or prior to the first day of the second extended term. These provisions were obviously designed to assure that Peabody Properties would achieve its purpose of reselling the Knapp Farm property at a profit or, if MIP did not exercise the options, MIP's rights would lapse. Peabody Properties could then proceed directly with efforts to develop and resell the land. Accordingly, we hold that the gains realized by the members of Peabody Properties from the sale of parcels of the Knapp Farm to MIP are taxable as ordinary income. To reflect the foregoing, Decisions *173 will be entered for the respondent in docket Nos. 1520-74, 1573-74, 1574-74, and 1575-74. Decision will be entered for the petitioner in docket No. 6536-75. Footnotes
1. The following cases are consolidated herewith: Robert C. Mathews and Sarah S. Mathews, docket No. 1573-74; Robert C. H. Mathews, Jr., and Alice C. Mathews, docket No. 1574-74; Parkway Development Company, docket No. 1575-74; and Metropolitan Industrial Park, Inc., docket No. 6536-75.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. The parties agree that this figure is correct. However, the record indicates that this figure should be $5,071,751.32.↩
4. As of July 8, 1966, Kroger had renewed its interest in purchasing a 45-acre tract in the MIP subdivision.↩
5. Respondent also determined a deficiency for the year 1970. However, that deficiency does not relate to the issues before this Court in the instant case.↩
6. The record is unclear as to whether the Knapp Farm consisted of 312 acres or 314 acres, but we have used 312 acres in this instance to reflect respondent's precise contention in the amendment to his answer.↩
7. The Supreme Court here referred to sec. 1.482-1(b)(1), Income Tax Regs., which is as follows: The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers.↩
8. This analysis, of course, holds equally true for other shareholders of MIP, such as Guaranty Realty (16.66 percent) and Leon Beard (16.66 percent), who held no interest in Peabody Properties.↩
9. This argument is an alternative position advanced in the event the Court rules in favor of MIP on the sec. 482 issue. Since we have held that the sec. 482 adjustment does not apply to MIP, a correlative adjustment affecting the petitioner-members of Peabody Properties is also inapplicable.↩
10. Petitioners contend that the group referred to as Peabody Properties was not a joint venture. However, we see no merit in this contention. Podell v. Commissioner,55 T.C. 429, 431↩ (1970). We have thus made a Finding of Fact that the oral agreement among petitioners Mathews, Mathews, Jr., Bransford, and Parkway established a joint venture.
11. Significantly, Baltz, the only member of the joint venture whose development activities are not shown to have been substantial, reported his share of the gain as ordinary income.↩